UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WOODLAND HARVESTING, INC.,
a Michigan corporation,

       Plaintiff,

                                   Case No. 09-10736

-vs-                                 Hon: AVERN COHN

GEORGIA PACIFIC CORPORATION,
a foreign corporation,

       Defendants.
_____/

**MEMORANDUM AND ORDER GRANTING IN PART AND STAYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

      This is a contract and fraud case.  Plaintiff Woodland Harvesting, Inc. (WHI) is a

Michigan corporation that supplies wood products including wood chips.  Defendant

Georgia Pacific, Corp. (GP) is a wholly owned subsidiary of Koch Industries, Inc. and is

based in Atlanta, Georgia.  WHI and GP entered into a series of contracts under which

WHI supplied wood chips to GP's particle board plant in Gaylord, Michigan.  In March

2006 GP closed its particle board plant and terminated the contract with WHI.  WHI

claims that GP's closure of the plant constituted a breach of contract as well as fraud.

The complaint is in seven counts:

      (I)      Breach of contract – termination of the May 20, 2005 contract,

      (II)     Breach of contract – failure to renew the March 3, 2000 contract,

      (III)    Breach of contract – covenants of good faith and fair dealing,

(IV)    Fraud in the Inducement,

(V)     Fraud,

(VI)    Silent Fraud, and

(VII)   Innocent Misrepresentation.

Now before the Court is GP's motion for summary judgment.  GP asserts that WHI's evidence in support of its contract claims is barred by the statute of frauds and parol evidence rule.  GP further asserts that WHI's fraud claims must be dismissed because they do not comply with Fed. R. Civ. P. 9(b) and are barred by the economic loss doctrine.  For the reasons that follow, the motion will be granted with respect to the contract claims and stayed with respect to the fraud claims pending WHI's filing of an amended complaint.

## II. FACTS

Beginning in the mid-1980s GP and WHI entered into a series of one-year contracts under which WHI supplied wood chips to GP's particle board plant in Gaylord, Michigan.  The contract was automatically renewed unless either party gave written notice 60 days before the end of the term.  The contracts also permitted either party to terminate a contract at any time with 90 days' notice.

On March 3, 2000, WHI and GP signed a new contract (2000 contract) with a five-year term.  It did not contain any provisions for renewal or early termination.  It did not include a merger clause.[1]  Under the terms of the contract, WHI was required to

---

[1]The contract did include the following provision: "Set forth herein are the terms and conditions for Georgia Pacific's purchase of Furnish material ("Furnish") to be used in the manufacturing of particleboard at the Gaylord facility . . . ."  There was no provision stating that the contract encompassed the entire agreement between the

maintain a one and a half year inventory of standing and cut timber.

WHI alleges that, during the negotiations for the 2000 contract, GP represented that the contract would be renewed automatically.  WHI further alleges that after the 2000 contract was signed, the parties agreed that the contract would be automatically renewed unless WHI defaulted.

After the 2000 contract expired, WHI and GP signed a new contract on May 20, 2005 (2005 contract).  The contract had a three year term and a provision for subsequent renewal.  It included an early termination clause which permitted either party to terminate the contract after 90 days notice.  The contract also contained a clause stating that GP intended to purchase 125,000 tons of wood chips per year, but was not required to purchase any minimum quantity.[2]  Otherwise, the 2005 contract did not differ from the 2000 contract.

WHI alleges that, during negotiations regarding the 2005 contract, GP represented that the early termination clause and non-binding volume clauses were merely generic requirements from GP's legal department and would have no effect on GP's performance.  WHI also alleges that both before and after the 2005 contract was signed, GP represented (1) that the early termination clause was subordinate to the clause stating GP's intent to purchase 125,000 tons of wood chips per year, (2) that GP

---

parties.

[2]Clause I.A.5. of the 2005 contract states in part: "It is understood and agreed that Georgia-Pacific is not obligated to purchase any minimum amount of chip-wood volume or services to be performed.  However, the intention of this contract is for G-P to purchase from Woodland Harvesting, Inc. approximately 125,000 ton per year based on 2,500 ton per week average quota for 50 weeks.

3

would not exercise the early termination provision during the contract's initial three-year

term, and (3)  that the contract would be automatically renewed unless WHI defaulted.

WHI asserts that after the 2005 contract was signed GP sought to alter the

contract by requiring WHI to supply a higher proportion of pine wood chips.  To

accommodate GP's request, WHI designed and built specialized sorting equipment to

produce the pine wood chips at a lower cost.  WHI's president, Roger Glawe, stated in

an affidavit that GP's agent, Frank Lawrence, was aware of WHI's purchase of the

sorting equipment and reviewed and signed off on the new equipment before WHI made

any capital expenditures.

In March 2006, GP informed WHI that it was closing the Gaylord plant.  It also

terminated the 2005 contract and suspended further deliveries of wood chips to the

plant.  The parties dispute the date on which the decision to close the Gaylord plant was

made.  WHI alleges that GP knew it would close the plant by October 2004, but

repeatedly represented to WHI that there were no plans to close the plant.[3]

### III.  STANDARD OF REVIEW

Summary judgment is appropriate when the evidence submitted shows that

"there is no genuine issue of material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A party claiming relief may move,

with or without supporting affidavits, for summary judgment on all or part of the claim."

Fed. R. Civ. P. 56(a).   Accordingly, the movant bears the initial responsibility of

---

[3] WHI asserts that it cannot establish the date and has made a discovery request regarding GP's decisionmaking process in closing the plant.  WHI has also lodged a news article describing the closing of the plant in which GP's spokesman, James Malone, states "We've been looking at this plant for a year and a half."

informing the court of the basis for its motion, and identifying what it believes

demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett,

477 U.S. 317, 323 (1986).  When a motion for summary judgment is properly made and

supported, an opposing party must set out specific facts showing a genuine issue for

trial.   Fed. R. Civ. P. 56(e).  All facts and inferences should be viewed in the light most

favorable to the nonmoving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59

(1970).

## IV.  ANALYSIS

### A. Legal Standards

#### 1. Breach of Contract

##### a.

To prevail on a breach of contract claim under Michigan law, a plaintiff must prove

the following elements: "(1) the existence of a contract between the parties, (2) the terms

of the contract require performance of certain actions, (3) a party breached the contract,

and (4) the breach caused the other party injury." Burton v. William Beaumont Hospital,

373 F. Supp. 2d 707, 718 (E.D. Mich. 2005) (citing Webster v. Edward D. Jones & Co., 197

F.3d 815, 819 (6th Cir. 1999).  When the contract language is clear, a court may decide on

the construction of the contract as a matter of law.  Meagher v.  Wayne State University,

222 Mich. App. 700, 721 (1997).  As a general rule, a court must give the words used in a

contract their plain and ordinary meaning. Rory v. Continental Insurance, Co., 473 Mich.

457, 464 (2005).  However, a court must analyze the contract as a whole, Old Kent Bank

v. Sobczak, 243 Mich. App. 57, 63 (2000), and supply a fair and reasonable interpretation

over a less just and less reasonable one.  Schroeder v. Terra Energy, Ltd., 223 Mich. App. 176, 188 (1997).

A court is rarely asked to interpret contract terms unless the parties dispute their meaning.  Because the parties' interests may have changed from the time of contracting to the time of litigation, courts have developed rules that limit the forms of evidence that can be used to prove the parties' intent in contracting.  Among these restrictions are the parol evidence rule and the statute of frauds.

### b. Parol Evidence Rule

In a contract for the sale of goods, "[t]erms . . . set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented."  MICH. COMP. LAWS § 440.2202.  A court must focus on the reason for asserting parol evidence and "where parol seeks to change the clear scope, effect, and obligation of the written contract, it should be rejected."  Gaydos v. White Motor Corp., 54 Mich. App. 143, 149 (1974).[4] However, the rule does not prohibit the subsequent modification of written contract terms, even if done orally.  Thus a court must determine whether the parol evidence involves a prior, contemporaneous, or subsequent agreement.  Further, the parol evidence rule only bars contradictory evidence and when a contract fails to include a merger clause, additional consistent terms may be included based on parol evidence.

---

[4]The parol evidence rule does not apply to a claim of fraud because a plaintiff alleging fraud is not seeking to change the terms of a written contract, but to establish that it is void due to the defendant's fraudulent actions.  Rood v. Midwest Matric Mart, Inc., 350 Mich. 559, 564 (1957)

### c. Statute of Frauds

The statute of frauds applies to all contracts for the sale of goods, MICH. COMP. LAWS § 440.2102, and requires that a contract be in writing and signed by the party against whom enforcement is sought if its value exceeds $1000, MICH. COMP. LAWS § 440.2201(1).  In addition, the statute of frauds applies to contract modification.  MICH. COMP. LAWS § 440.2209(3).  There is no authority stating whether Michigan follows a broad interpretation of §440.2209(3), requiring compliance with the statute of frauds for any modification, or a narrow interpretation of §440.2209(3), requiring compliance with the statute of frauds only when a modification increases the quantity term.  See Tom. L. Holland, Modifications of Sales Contracts: Complying with the Statute of Frauds, 22 UCC L. J. 301, 302, 304-05 (1990).  However, a comment to §440.2209 states that "[s]ubsections (2) and (3) are intended to protect against false allegations of oral modifications."  MICH. COMP. LAWS § 440.2209 cmt. 3.  The concern over false allegations of oral modification applies equally to all contract provisions, regardless of whether the modification concerns the quantity of goods under the contract, suggesting that compliance is required for all modifications.  Therefore, all contracts and contract modifications must be signed and in writing if the contract is subject the statute of frauds.

However, the UCC provides  a number of exceptions to the statute of frauds for specially manufactured goods, admissions by a party-opponent, and acceptance of goods or payment.  MICH. COMP. LAWS § 440.2201(3).  With respect to specially manufactured goods, the UCC states:

> A contract that does not satisfy the requirements of subsection (1) but is valid in other respects is enforceable in any of the following circumstances:

> (a) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement.

Id.  Specially manufactured goods are excepted from the statute of frauds because, "by virtue of the unique nature of the goods, the manufacturer would not have produced such unique goods absent an agreement with the alleged buyer." Webcor Packing Corp. V. Auto Zone, Inc., 158 F.3d 354, 356 (6th Cir. 1998).  The Sixth Circuit applies a four-part test to determine whether this exception applies:

> 1) the goods must be specially made for the buyer;
> 2) the goods must be unsuitable for sale to others in the ordinary course of the seller's business;
> 3) the seller must have substantially begun to have manufactured the goods or to have a commitment for their procurement; and
> 4) the manufacture or commitment must have been commenced under circumstances reasonably indicating that the goods are for the buyer and prior to the seller's receipt of notification of contractual repudiation.

Id.  The focus of the inquiry must be on the goods themselves – not the seller's manufacturing process or investments – and must show that "the goods themselves have some feature that makes the product marketable only to the buyer."  Id. at 357.

## 2. Fraud

### a. FED. R. CIV. P. 9(b)

A plaintiff alleging fraud must meet FED. R. CIV. P 9(b)'s heightened pleading standard by "stat[ing] with particularity the circumstances constituting fraud or mistake." The threshold test under Rule 9(b) is "whether the complaint places the defendant on

8

sufficient notice of the misrepresentation, allowing the defendant[] to answer, addressing in an informed way plaintiff's claim of fraud." Coffey v. Foamex L.P., 2 F.3d 157, 162 (6th Cir. 1993) (internal quotations omitted). A plaintiff must allege, at a minimum, "the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme, the fraudulent intent of the defendants, and the injury resulting from the fraud." Id. at 161-62. In other words, a plaintiff must plead each element of a fraud claim with enough specificity so that a defendant can ascertain both the allegedly fraudulent statement as well as the context in which it was made.

Although a fact-intensive inquire is required to determine the sufficiency of a complaint, there are some general guidelines that a court customarily follows. For example, a plaintiff failed to comply with Rule 9(b) when the complaint alleged that defendant corporation told him that "he could sell the Property or refinance the loans in two years, if he had trouble paying the monthly loan payment." King v. Bank of America, Corp., No. 09-12481, 2009 WL 2960425, at *5 (E.D. Mich. Sept. 11, 2009). Plaintiff was required to amend his complaint and include:

> (1) the name of the individual(s) who made the representation (or the name of their employer); (2) where the representation was made, (3) the content of the representation, (4) the fraudulent scheme, (5) the fraudulent intent of the individual(s) who made the representation; and (6) the injury [plaintiff] suffered as a result of the representation."

Id. However, absolute precision is not necessarily needed and a complaint alleging that defendant made representations during meetings held between October 7, 1996 and January 10, 1997 was found sufficient even though precise dates or locations were not provided. Kukuk v. Fredal, No. 99-74014, 2001 WL 1218557, at *5 (E.D. Mich. Aug. 1,

2001).  However, in Kukuk the complaint did specify the individuals who made and heard the alleged misrepresentations.  Id at *2.  Thus the "time, place, and content" rule in Coffey can be relaxed so long as the complaint provides the defendant with sufficient notice and answer and defend the claim.

Even if a plaintiff's complaint fails to meet the requirements of Fed. R. Civ. P. 9(b), dismissal may not be appropriate, especially when the defendant has not filed a motion for a more definite statement under FED. R. CIV. P. 12(e).  Coffey, 2 F.3d at 162.  A court considers a number of factors when deciding whether to permit a plaintiff to amend his complaint.  First, the court should determine whether a plaintiff was already on notice of the pleadings' deficiencies.  United States ex rel. Bledsoe v. Community Health Systems, Inc. 342 F.3d 634, 644 (6th Cir. 2003).  The court must also consider whether there is undue delay, bad faith, or a dilatory motive on the part of the plaintiff.  Id.  Second, the court should consider whether the defendant will suffer undue prejudice if a plaintiff is given an opportunity to amend the complaint.  Id.   Finally, the court must determine, based on the record before it, whether the plaintiff can potentially amend the complaint to state a claim for fraud.  Id. at 645.  When the defendant files a motion for summary judgment, the court may consider evidence outside the complaint itself in determining whether amendment should be permitted.  See Coffey, 2 F.3d at 162-63.

### b. Economic Loss Doctrine

A claim of fraud may be barred by the economic loss doctrine when it arises out of a contractual relationship.  The purpose of the economic loss doctrine is to prevent contract law from "drown[ing] in a sea of tort."  Neibarger v. Universal Cooperative, Inc., 439 Mich. 512, 528 (1992).  The doctrine "provides that [w]here a purchaser's expectations in a sale

10

are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only economic damages." Id. at 520. While many disputes can be framed in either tort or contract terms, "contract principles . . . are generally more appropriate for determining claims for consequential damages that the parties have, or could have, addressed in their agreement." Id. at 521. Initially, Michigan only applied the economic loss doctrine to unintentional tort claims such as negligence. Huron Tool and Engineering Co. v. Precision Consulting Services, Inc., 209 Mich. App. 365, 368 (1995). The Huron Tool court held that the economic loss doctrine did not bar claims for intentional torts such as fraud in the inducement when the alleged fraud was extraneous to the contractual dispute. Id. at 375.

The applicability of the economic loss doctrine to a claim of fraud turns on whether the parties could have resolved the issue through a contract provision.[5] Analyzing a claim of fraud in the inducement, the Huron Tool court stated:

> Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely – which normally would constitute grounds for invoking the economic loss doctrine – but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior. In contrast, where the only misrepresentation concerns the quality or character of the goods sold, the other party is still free to negotiate warranty and other terms to account for possible

---

[5]One court has suggested that the economic loss doctrine bars all fraud claims except fraud in the inducement. Huron Tool, 209 Mich. App. at 371 ("Courts generally have distinguished fraud in the inducement as the only kind of fraud claim not barred by the economic loss doctrine. We believe that this distinction is warranted in light of the rationale of the economic loss doctrine."). However, a careful analysis suggests that application of the economic loss doctrine should be based on the distinction between "fraud extraneous to the contract and fraud interwoven with the breach of contract." Id. at 373.

defects in the goods.

Id at 372-73.  The Michigan Supreme Court has endorsed a like analysis of the economic loss doctrine, upholding a trial courts's application of the economic loss doctrine "for the reasons stated in the Court of Appeals dissenting opinion".  General Motors Corp. v. Alumi-Bunk, Inc., 482 Mich. 1080, 1080 (2008).  This case  involved a automobile sales contract where defendant, Alumi-Bunk, received a substantial discount for the purchase of 148 trucks from GM and then began selling the trucks to consumers.  General Motors Corp. v. Alumi-Bunk, Inc., 2007 WL 2118796, at *1 (Mich. App. July 24, 2007) rev'd 482 Mich. 1080 (2008).  GM alleged that Alumi-Bunk had agreed to "upfit" the trucks prior to sale so that they would not complete with other dealers; however the sales contract did not include this limitation.  Id.  Judge Kelly's dissent stated:

> What GM asserts amounts to fraudulent inducement was actually GM's unilateral mistake of failing to include in a term in the CAP that GM later realized was critical.  This Court does not consider a unilateral mistake sufficient to modify a previously negotiated agreement.  At all times, GM was free to guard against any potential or perceived economic risk of defendants' failure to upfit the vehicles by including a provision in the CAP.  Defendants cannot be held liable for GM's failure to do so.

Id. at *11 (Kelly, J. dissenting).   Thus the proper inquiry when applying the economic loss doctrine to a fraud claim is whether a plaintiff could have protected its interests through the contract or whether the plaintiff was prevented from making a free and informed decision due to the defendant's fraud.

## B. DISCUSSION

### 1. Contract Claims

#### a. 2005 Contract

WHI claims that GP breached the 2005 agreement by terminating it prior to end of the three-year term.  GP asserts that its exercise of the early termination clause cannot constitute a breach.[6]  GP is entitled to summary judgment because the 2005 contract permitted either party to unilaterally terminate the contract with 90 days notice.

First the contract is neither contradictory nor ambiguous with respect to the early termination clause.  Although WHI's assertion that the early termination clause is contradicted by the clause stating GP's intent to purchase 125,000 tons of wood chips per year for three years, these clauses address different issues.  GP's statement of intent describes the quantity of goods covered by the contract while the early termination clause addresses the duration of the contract.  It would be unreasonable to consider the early termination clause as subordinate to the quantity term as WHI suggests because that makes the early termination clause a nullity.  Over the course of their business relationship WHI and GP have negotiated contracts with and without early termination clauses.  The inclusion of such a clause in this contract is a clear indication of the parties' intent to create a unilateral right to terminate with 90 days notice.  GP did not breach the contract when it exercised this right.

Second, the alleged oral agreements and modifications on which WHI relies are

---

[6]GP acknowledges that a dispute continues regarding its liability during the 90 day notice period; it has not moved for summary judgment with respect to that portion of WHI's claim.  Therefore, WHI may continue to pursue recovery for harms it incurred through GP's refusal to accept delivery of wood chips during the 90 day notice period.

13

unenforceable under the statute of frauds. WHI alleges that GP orally agreed (1) that the contract would be automatically renewed at the end of the three year term, (2) that the contract would be automatically renewed unless WHI defaulted during the three year term, (3) that GP would not exercise the 90-day termination clause during the initial three-year term, and (4) that the 90-day termination clause would be subordinate to the 125,000 ton per year volume term. The contract between WHI and GP is subject to the statute of frauds because the wood chips are a good and the value of the contract exceeded $1000. The alleged oral modifications were not in writing and were not signed by GP as required by the statute of frauds. As a result, WHI cannot enforce these modifications against GP, even if they orally agreed upon them.

Finally, WHI cannot rely on the specially manufactured goods exception of the UCC to avoid the requirements of the statute of frauds. WHI asserts that GP demanded a higher quantity of pine wood chips than was specified under the written contract and, to meet this demand, it designed, purchased, and built specialized sorting equipment. However, the purchase of specialized sorting equipment and investment in inventory cannot convert otherwise ordinary pine wood chips into specially manufactured goods. The fact that WHI invested in a specialized process to create pine wood chips at a low cost and was unable to find another buyer for the chips after GP terminated the contract does not alter the nature of the chips themselves. WHI was and remains a supplier of wood products, including wood chips. There is nothing in the record to suggest that these pine wood chips were so unique that they were "not suitable for sale to others in the ordinary course of [WHI's] business." MICH. COMP. LAWS § 440.2201(3). Therefore, WHI cannot avoid the requirements of the statute of frauds with respect to the 2005 contract.

14

Because the written contract gave GP a right to early termination and any oral modifications are unenforceable under the statute of frauds, GP's motion must be granted with respect to Count I.  WHI may continue to pursue a claim for damages occurring during the 90-day notice period.

### b. 2000 Contract

GP is also entitled to summary judgment with respect to WHI's allegation that it breached the 2000 contract by failing to renew it.  GP was under no obligation to renew the 2000 contract because the written contract contained no renewal provision. As explained above, WHI cannot rely on any alleged oral modification of the written agreement due to the application of the statute of frauds.[7]  Because GP did not breach the 2000 contract by failing to renew it, it is entitled to summary judgment on count II.  No further discussion is necessary regarding WHI's allegations regarding the 2000 contract.  It is <u>functus officio</u>.

### c. Duty of Good Faith and Fair Dealing

Finally, WHI claims that, with respect to the 2005 contract,  GP breached it duty of good faith and fair dealing.  The UCC states that "[e]very contract or duty within this act imposes an obligation of good faith in its performance or enforcement." Mich. Comp. Laws § 440.1203.  The official comment to the statute states:

> This section does not support an independent cause of action for failure to perform  or enforce in good faith.  Rather, this section means that a failure to perform or enforce, in good faith,  a  specific  duty  or  obligation  under  the  contract,

---

[7]Even if the Court were to find the oral modifications valid, WHI could not prevail on this claim.  After the 2000 contract expired, WHI agreed to and signed the 2005 contract which covered the same matters as the 2000 contract.  Therefore, the 2005 contract is at best a modification of the 2000 contract.  Because of the statute of frauds, the terms of the 2005 contract control over any prior oral agreement.

> constitutes a breach of that contract . . . . This distinction
> makes it clear that the doctrine of good faith merely directs a
> court towards interpreting contracts within the commercial
> context in which they are created, performed, and enforce, and
> does not create a separate duty of fairness and
> reasonableness which can be independently breached.

Id. cmt; see also Fodale v. Waste Management of Michigan, Inc., 271 Mich. App. 11, 35 (2006) (holding that Michigan does not recognize an independent cause of action for breach of covenant of good faith and fair dealing); Belle Isle Grill Corp. v. Detroit, 256 Mich. App. 463, 476 (2003 (same).  Because WHI has not alleged that GP breached any specific provision of the 2005 contract, it cannot maintain a cause of action for the breach of the covenant of good faith and fair dealing.[8]  Therefore, GP is entitled to summary judgment with respect to Count III.

### 2. Fraud Claims

#### a.

WHI's complaint includes the following fraud claims: common law fraud,[9] fraud in the inducement[10], silent fraud,[11] and innocent misrepresentation.[12]  WHI did not make any

---

[8]To the extent that WHI's claim is based on GP's alleged breaches concerning the termination of the 2005 contract, it must be dismissed for the reasons discussed above.

[9]Michigan law requires that a plaintiff alleging common law fraud prove that "(1) [t]he defendant made a material representation, (2) that it was false, (3) that when he made it he knew it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion, (4) that he made it with the intention that it should be acted upon by plaintiff, (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury."  Hi-Way Motor Co. v. International Harvester Co., 398 Mich. 330, 336 (1976).

[10]"Fraud in the inducement occurs where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon."  Samuel D. Begola Services, Inc. v. Wild Brothers, 210

16

specific allegations for each fraud claim in its complaint.  Instead, it incorporated the factual allegations previously made in support of its breach of contract claims.  The previous factual allegations included the following:

1. "During negotiations for the [2005] contract" GP represented that the two changes from the prior contract (that GP was not obligated to purchase any minimum volume of wood chips and that either party could terminate the agreement with 90 days notice) were general legal requirements from headquarters and would have no effect on the performance of the contract.

2. GP "repeatedly" represented that it had no plans to close the plant and had not considered closing the plant.

With respect to  these representations, WHI alleges that each proved to be false and that WHI relied on each to its detriment.

The only count with specific allegations is WHI's claim of silent fraud.  In this claim, WHI alleges that GP had a duty to disclose information related to the closing of the particle board plant and, by failing to do so, left WHI with a false impression.  However, it did not allege the circumstances under which the duty to disclose arose.

**b.**

---

Mich. App. 636, 639 (1995).

[11]Silent fraud arises when a party fails to fully disclose material facts within its knowledge after inquiry and the inquiring party relies on that lack of disclosure to its detriment.  M&D, Inc. v. W.B. McConkey, 231 Mich. App. 22, 29 (1998).

[12]"A claim of innocent misrepresentation is shown where a party detrimentally relies on a false representation in such a manner that the injury inures to the benefit of the party making the representation."  Forge v. Smith, 458 Mich. 198, 211 (1998).  The individual making the representation need not be aware of its falsity.  Id.

WHI's fraud claims fail to meet the pleading standard of FED. R. CIV. P. 9(b) because they lack sufficient specificity to give GP notice of the claims against it.  First, WHI does not make any specific allegations with respect to its claims of fraud, fraud in the inducement, and innocent misrepresentation.  Instead, it simply incorporates the prior allegations in the complaint.  As a result, it is unclear which, if any, of the representations described above form the basis of each fraud claim.  Without such guidance, GP cannot discern the nature of the claims against  it or form an answer and defense to them.  Although WHI made specific allegations with respect to its claim of silent fraud, they are insufficient because they fail to describe the inquiry which gave rise to a duty to disclose.  McConkey, 231 Mich. App. at 29.

Further, if WHI had restated the factual allegations described above for each fraud claim, the allegations would still lack sufficient specificity.  First, WHI merely states that GP made the representations, but does not describe the individuals involved.  Without notice of who made the alleged representations or to whom they were made, GP lacks sufficient notice to understand the charges and defend itself.  Further, WHI only provides vague descriptions of when the representations occurred.  Although specific dates may not be necessary, Kukuk, 2001 WL 1218557, at *5, WHI must narrow the relevant time period to some degree.  Merely stating that the representations occurred "during negotiations" or "before and after the contract was formed" provides a time period that is too open-ended to give adequate notice to GP.  The purpose of FED. R. CIV. P. 9(b) is to ensure that a defendant understands the factual basis for the fraud charge so that it can form a proper defense.  Given the long relationship and many interactions between WHI and GP, these general statements alleging misrepresentations do not properly alert GP of the

18

circumstances under which the alleged fraud occurred.

Still, it would be inappropriate to grant GP's motion for summary judgment because GP has not filed a motion for a more definite statement under FED. R. CIV. P. 12(e). As a result, WHI did not have prior notice that the fraud allegations in its complaint were deficient. In addition, WHI has not asserted that there was undue delay, bad faith, a dilatory motive, or potential prejudice. Further, the affidavit of WHI president, Roger Glawe, describes in much greater detail the interactions between himself and GP's agent, Frank Lawrence, that gave rise to at least some of WHI's fraud allegations. Although Glawe's affidavit cannot cure the deficiencies in WHI's complaint, it suggests that WHI can successfully state a claim of fraud if given the opportunity to amend its complaint. Therefore, GP's motion for summary judgment will be stayed with respect to WHI's fraud claims to give WHI an opportunity to amend the compliant to comply with FED. R. CIV. P. 9(b).[13] When addressing fraud claims brought against GP by other wood chip providers after GP's closure of the Gaylord plant, another judge in this district reached the same conclusion and permitted wood chip providers to amend their complaint to comply with FED. R. CIV. P. 9(b). Timberline Logging v. Georgia-Pacific Corp., No. 06-14004 (E.D. Mich. Dec. 14, 2006) (unpublished).

### c.

GP also asserts that WHI's fraud claims should be dismissed because they are

---

[13]Claims of fraud must also comply with FED. R. CIV. P. 8. Although more liberal than Rule 9(b), the pleading requirements under Rule 8 have increased significantly in recent years. See Aschcroft v. Iqbal, 129 S.Ct. 1937 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). WHI must also comply with the requirements of these cases in its amended complaint.

barred by the economic loss doctrine.  The economic loss doctrine does not bar all tort claims when a contractual relationship exists between the parties.  Because of the deficiencies in WHI's complaint, the Court is unable to discern the basis for each of WHI's fraud claims.  As a result, it cannot determine whether or not the claims are barred by the economic loss doctrine.  Therefore there will be finding with respect to the economic loss doctrine and GP is free to renew this defense after WHI has filed an amended complaint.

## V.  CONCLUSION

For the reasons stated above, GP's motion is GRANTED with respect to Count I, II, and III and STAYED with respect to Counts IV, V, VI, and VII.  WHI shall submit an amended complaint by February 5, 2010 describing with specificity the factual basis for each fraud claim.

SO ORDERED.


Dated:  January 14, 2010

_s/ Avern Cohn_____
AVERN COHN
UNITED STATES DISTRICT JUDGE



I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, January 14, 2010, by electronic and/or ordinary mail.

_s/ Julie Owens_____
Case Manager, (313) 234-5160

20