UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


WOODLAND HARVESTING, INC.,
a Michigan corporation,

     Plaintiff,

                               Case No. 09-10736
-vs-                            Hon: AVERN COHN

GEORGIA PACIFIC CORPORATION,
a foreign corporation,

     Defendants.
_____/

**MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART**

**DEFENDANT'S MOTION TO DISMISS**

### I. Introduction

     This is a fraud case.  Plaintiff, Woodland Harvesting, Inc. (WHI), a Michigan

corporation, is in the business of supplying wood products including wood chips.

Defendant, Georgia Pacific, LLC[1] (GP), a wholly owned subsidiary of Koch Industries,

Inc., is based in Atlanta, Georgia and is the former operator of a particle board plant in

Gaylord, Michigan (Gaylord plant).  WHI alleges that GP engaged in fraud by failing to

disclose that it was considering the sale and closure of the Gaylord plant while

negotiating a long-term contract in 2005 and subsequently exercising an early

termination clause in the contract in 2006 after closing the Gaylord plant.  On January

14, 2010, the Court granted GP's motion to dismiss WHI's fraud claims; it also permitted

---

     [1] Defendant's notified this Court in its motion for summary judgment that
Defendant was improperly named as Georgia Pacific Corporation.

WHI to amend its complaint to state its fraud claims with more particularity. WHI filed an amended complaint containing five counts:

(I.) fraud in the inducement;

(II.) silent fraud;

(III.) innocent misrepresentation;

(IV.) promissory estoppel;[2] and

(V.) exemplary damages.[3]

Now before the Court is GP's motion to dismiss. GP asserts that WHI failed to plead its claims in conformity with Fed. R. Civ. P. 8(a) and 9(b) and that, even if plead properly, the fraud claims would be barred by the economic loss doctrine. GP further asserts that WHI did not obtain leave from the Court to file its promissory estoppel claim and that WHI failed to state claim for promissory estoppel because the doctrine is inapplicable when a written contract exists. For the reasons that follow, GP's motion to dismiss will be granted with respect to Counts I, II, and III and will be denied with respect to Counts IV and V.

---

[2] This count was not raised by WHI in its original complaint.

[3]"Because exemplary damages are a sanction and not an independent cause of action, the Court will not analyze Plaintiff's claim for exemplary damages as a separate cause of action." Sneyd v. International Paper Co. Inc., 142 F. Supp. 2d 819, 822 (E.D. Mich. 2001).

## II. Background

### A. Factual Background[4]

GP acquired the Gaylord plant in 1987.  Since GP's purchase, WHI supplied woodchips to the Gaylord plant.  At all relevant times, WHI was the largest supplier to the Gaylord plant and GP was WHI's largest customer, purchasing ninety percent of WHI's woodchip production.  GP and WHI operated under a series of contracts for the supply of woodchips, including contracts signed in March 2000 (2000 Contract) and May 2005 (2005 Contract).

After the expiration of the 2000 Contract, the parties sought to negotiate a new contract.  GP proposed a contract with two terms that differed from the 2000 Contract: an early termination clause[5] and a clause stating that GP intended to purchase 125,000 tons of woodchips per year, but provided GP with discretion regarding the actual quantity of woodchips purchased.[6]

WHI alleges that during a meeting in a Gaylord restaurant between May 5 and May 19, 2005 WHI's President, Roger Glawe, asked GP's Wood Procurement Manager and authorized signatory, Frank Laurence (Laurence), why the additional clauses were added to the proposed contract.  WHI further alleges that Laurence responded by

---

[4]The following facts are taken from WHI's complaint and the contracts executed by the parties.  The affidavits and newspaper articles included as exhibits to WHI's response will not be considered given the nature of GP's motion.

[5] Clause III.B. states: "Either party may terminate this Contract at any time upon providing 90 days' written notice to the other party."

[6] Clause I.A.5. states: "It is understood and agreed that Georgia-Pacific is not obligated to purchase any minimum amount of chip-wood volume or services to be performed."

stating that the clauses were items "that G-P's lawyers in Atlanta required as a matter of rule in their contracts" but assured WHI that it "would be business as usual" and that "G-P would indeed purchase the 125,000 tons of woodchips per year for the next three years." Satisfied with Laurence's response, WHI signed the contract on May 20, 2005.

WHI also says that, prior to the execution of the 2005 contract, GP had expressed an interest in incorporating more pine woodchips because pine wood's long fibers result in stronger particle board. However, WHI could not produce pine woodchips at a competitive price because lumber-grade pine could be sold at a high price and it was not economically feasible to hand sort non-lumber grade pine. Despite the added cost, WHI says that during late May and early June 2005 Laurence continued to mention GP's desire to incorporate more pine chips to Dan Glawe, Roger Glawe's brother and WHI's Field Operations Manager. Dan Glawe and Laurence spoke by telephone every day and met for breakfast once per week.

WHI alleges that in June 2005 Dan Glawe told Laurence that WHI could produce pine woodchips at a competitive price by incorporating a mechanical sorter to separate lumber-grade logs from smaller logs. However, Dan Glawe told Laurence that WHI would have to make a sizeable investment to procure such a sorter and would not do so if GP retained the right to terminate the agreement with 90 days notice and would not commit to purchase woodchips from WHI for the next three years. It further alleges that Laurence responded by telling Dan Glawe that GP "would not only purchase 125,000 tons of deciduous woodchips per year for three years, but would also purchase all of the pine woodchips WHI could produce" if WHI purchased the sorter.

WHI says that, in reliance on Laurence's representations, it contracted for the design and fabrication of a mechanical sorter at a cost of $260,000-280,000 and spent additional sums to transport and assemble the sorter. It also purchased additional stumpage contracts to supply the pine woodchips.

In December 2005 GP was sold in its entirety to Koch Industries for $21 billion.[7] On March 1, 2006 GP closed the Gaylord plant without notice and terminated its contract with WHI.

WHI alleges, "upon information and belief" that during negotiation of the 2005 contract and during discussions regarding the purchase of the sorting machine GP was "either in negotiations, anticipated being in negotiations or had negotiated with a third party(s) for the sale of itself, its assets, or its non-consumer product assets" and that a subsequent purchaser "might choose to close or scale back the Gaylord Plant." It further alleges that this information was not disclosed to WHI because GP wanted to ensure a continuous supply of woodchips until a decision was made with respect to the sale or closure of the plant.

## B. Procedural Background

On February 26, 209 WHI filed suit against GP, claiming breach of contract and fraud. (Doc. 1) GP filed a motion styled as a motion for summary judgment on August

---

[7]Although WHI's complaint does not address GP's sale to Koch, the Court takes judicial notice of this fact. See Koch Industries Inc., Forest and Consumer Products, http://kochind.com/IndustryAreas/forestry.aspx (last visited July 7, 2010). A court may consider such information when addressing a motion to dismiss under FED. R. CIV. P. 12(b)(6). New England Health Care Employees Pension Fund v. Ernst & Young, LLP, 336 F.3d 495, 501 (6th Cir. 2003) abrogated by Merck & Co. v. Reynolds, 130 S.Ct. 1784 (2010).

12, 2009.  (Doc. 12.)  On January 14, 2010, the Court granted GP's motion with respect

to the contract claims, but stayed the fraud claims to allow WHI to amend its complaint

to conform to FED. R. CIV. P. 8(a) and 9(b).  (Doc. 20.)  WHI filed an amended complaint

on February 4, 2010.  (Doc. 21.)  On March 11, 2010, GP filed a second motion styled

as a motion for summary judgment which is now before the Court.  (Doc. 25.)  In the

motion, GP asserts that the complaint is deficient under Fed. R. Civ. P. 8(a) and 9(b),

citing FED. R. CIV. P. 12(b)(6) as the appropriate standard of review.  At a hearing held

on June 30, 2010, GP stated that the motion should be construed as a motion to

dismiss for failure to state a claim, not a motion for summary judgment.  The Court will

consider the motion accordingly.

### III. Standard of Review

### A. Motion to Dismiss

A motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) tests the sufficiency of a

complaint. To survive a Rule 12(b)(6) motion, the complaint's "factual allegations must be

enough to raise a right to relief above the speculative level on the assumption that all of the

allegations in the complaint are true." Bell Atlantic Corp. v. Twombley, 550 U.S.544, 545

(2007); see also Ass'n of Cleveland Fire Fighters v. City of Cleveland, 502 F.3d 545, 548

(6th Cir. 2007). The court is "not bound to accept as true a legal conclusion couched as a

factual allegation."  Ashcroft v. Iqbal, ___ U.S. ___, 129 S.Ct. 1937, 1950 (2009) (internal

quotation marks and citation omitted). Moreover, "[o]nly a complaint that states a plausible

claim for relief survives a motion to dismiss." Id. Thus, "a court considering a motion to

dismiss can choose to begin by identifying pleadings that, because they are no more than

conclusions, are not entitled to the assumption of truth. While legal conclusions can provide

the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. In sum, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." Id. at 1949 (internal quotation marks and citation omitted).  This is a rather rigid test which must be carefully applied.

**B. Fed. R. Civ. P. 9(b)**

**1.**

A plaintiff alleging fraud must also meet Fed. R. Civ. P. 9(b)'s heightened pleading standard by "stat[ing] with particularity the circumstances constituting fraud or mistake."  The threshold test under Rule 9(b) is "whether the complaint places the defendant on sufficient notice of the misrepresentation, allowing the defendant[] to answer, addressing in an informed way plaintiff's claim of fraud."  Coffey v. Foamex L.P., 2 F.3d 157, 162 (6th Cir. 1993) (internal quotations omitted).  A plaintiff must allege, at a minimum, "the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme, the fraudulent intent of the defendants, and the injury resulting from the fraud."  Id. at 161-62.  In other words, a plaintiff must plead each element of a fraud claim with enough specificity so that a defendant can ascertain both the allegedly fraudulent statement as well as the context in which it was made.

Although a fact-intensive inquire is required to determine the sufficiency of a complaint, there are some general guidelines that a court customarily follows. For example, a plaintiff failed to comply with Rule 9(b) when the complaint alleged that defendant corporation told him that "he could sell the Property or refinance the loans in two years, if he had trouble paying the monthly loan payment." King v. Bank of America, Corp., No. 09-12481, 2009 WL 2960425, at *5 (E.D. Mich. Sept. 11, 2009). Plaintiff was required to amend his complaint and include:

> (1) the name of the individual(s) who made the representation (or the name of their employer); (2) where the representation was made, (3) the content of the representation, (4) the fraudulent scheme, (5) the fraudulent intent of the individual(s) who made the representation; and (6) the injury [plaintiff] suffered as a result of the representation."

Id. However, absolute precision is not required and a complaint alleging that defendant made representations during meetings held between October 7, 1996 and January 10, 1997 was found sufficient even though precise dates or locations were not provided. Kukuk v. Fredal, No. 99-74014, 2001 WL 1218557, at *5 (E.D. Mich. Aug. 1, 2001). However, in Kukuk the complaint did specify the individuals who made and heard the alleged misrepresentations. Id at *2. Thus the "time, place, and content" rule in Coffey can be relaxed so long as the complaint provides the defendant with sufficient notice to answer and defend the claim.

## IV. Analysis

## A. The Law

## 1. Fraud in the Inducement

Under Michigan law, "a promise regarding the future cannot form the basis of a misrepresentation claim. Forge v. Smith, 458 Mich. 198, 212 (1998). However, fraud in the inducement is an exception that "occurs where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon." Samuel D. Begola Services, Inc., v. Wild Brothers, 210 Mich. App. 636, 639 (1995). As with any claim of fraudulent misrepresentation, a plaintiff must show that:

> "(1) that the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered actual damage."

Rooyakker & Sitz, P.L.L.C. v. Plante & Moran, P.L.L.C., 276 Mich. App. 146, 161 (2007) (citations omitted); see also M&D Inc. v. W.B. McConkey, 231 Mich. App. 22, 27 (1998).

## 2. Silent Fraud

The elements of silent fraud are the same as the elements for fraudulent misrepresentation described above. See McMullen v. Joldersma, 174 Mich. App. 207, 213 (1988). But rather than involving an affirmative misrepresentation, silent fraud arises when a party fails to fully disclose material facts within its knowledge after inquiry by another party. McConkey, 231 Mich. App. at 29. Relying on Michigan Supreme

Court precedent, the McConkey court held that "in order to prove a claim of silent fraud, a plaintiff must show that some type of representation that was false or misleading was made and that there was a legal or equitable duty of disclosure." Id. at 31. Additionally, a claim of silent fraud requires some proof of reasonable reliance on the misleading or false representation. Id. at 29. Thus, to sustain a claim of silent fraud, a plaintiff must show that the defendant intentionally failed to disclose material facts that it had an obligation to disclose and that plaintiff reasonably and detrimentally relied upon the defendant's misrepresentations.

### 3. Innocent Misrepresentation

Innocent misrepresentation is "a species of fraudulent misrepresentation" that eliminates the "need to show a fraudulent purpose." McConkey, 231 Mich. App. at 27-28. "A claim of innocent misrepresentation is shown where a party detrimentally relies on a false representation in such a manner that the injury inures to the benefit of the party making the representation." Forge v. Smith, 458 Mich. 198, 211 (1998). Unlike other fraud claims, the individual making the representation need not be aware of its falsity. Id. A party claiming innocent misrepresentation must otherwise satisfy all of the requirements described above with respect to fraudulent misrepresentation.

### 4. Economic Loss Doctrine

A well-pleaded claim of fraud may be barred by the economic loss doctrine when it arises out of a contractual relationship. The purpose of the economic loss doctrine is to prevent contract law from "drown[ing] in a sea of tort." Neibarger v. Universal Cooperative, Inc., 439 Mich. 512, 528 (1992). The doctrine "provides that [w]here a

purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only economic damages." Id. at 520. While many disputes can be framed in either tort or contract terms, "contract principles . . . are generally more appropriate for determining claims for consequential damages that the parties have, or could have, addressed in their agreement." Id. at 521. Initially, Michigan only applied the economic loss doctrine to unintentional tort claims such as negligence. Huron Tool and Engineering Co. v. Precision Consulting Services, Inc., 209 Mich. App. 365, 368 (1995). The Huron Tool court extended the economic loss doctrine to include intentional torts, but held that it did not bar a claim of fraud in the inducement when the alleged fraud was extraneous to the contractual dispute. Id. at 375.

The applicability of the economic loss doctrine to a claim of fraud turns on whether the parties could have resolved the issue through a contract provision.[8] Analyzing a claim of fraud in the inducement, the Huron Tool court stated:

> Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely – which normally would constitute grounds for invoking the economic loss doctrine – but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior. In contrast, where the only misrepresentation concerns the

_____

[8]One court has suggested that the economic loss doctrine bars all fraud claims except fraud in the inducement. Huron Tool, 209 Mich. App. at 371 ("Courts generally have distinguished fraud in the inducement as the only kind of fraud claim not barred by the economic loss doctrine. We believe that this distinction is warranted in light of the rationale of the economic loss doctrine."). However, a careful analysis suggests that application of the economic loss doctrine should be based on the distinction between "fraud extraneous to the contract and fraud interwoven with the breach of contract." Id. at 373.

> quality or character of the goods sold, the other party is still
> free to negotiate warranty and other terms to account for
> possible defects in the goods.

Id at 372-73.  The Michigan Supreme Court has endorsed a like analysis of the

economic loss doctrine, upholding a trial courts's application of the economic loss

doctrine "for the reasons stated in the Court of Appeals dissenting opinion".  General

Motors Corp. v. Alumi-Bunk, Inc., 482 Mich. 1080, 1080 (2008).  That case involved an

automobile sales contract where defendant, Alumi-Bunk, received a substantial discount

for the purchase of 148 trucks from GM and then began selling the trucks directly to

consumers.  General Motors Corp. v. Alumi-Bunk, Inc., 2007 WL 2118796, at *1 (Mich.

App. July 24, 2007) rev'd 482 Mich. 1080 (2008).  GM alleged that Alumi-Bunk had

agreed to "upfit" the trucks prior to sale so that they would not complete with other

dealers; however the sales contract did not include this limitation.  Id.  Judge Kelly's

dissent stated:

> What GM asserts amounts to fraudulent inducement was
> actually GM's unilateral mistake of failing to include in a term
> in the CAP that GM later realized was critical.  This Court
> does not consider a unilateral mistake sufficient to modify a
> previously negotiated agreement.  At all times, GM was free
> to guard against any potential or perceived economic risk of
> defendants' failure to upfit the vehicles by including a
> provision in the CAP.  Defendants cannot be held liable for
> GM's failure to do so.

Id. at *11 (Kelly, J. dissenting).   Thus the proper inquiry when applying the economic

loss doctrine to a fraud claim is whether a plaintiff could have protected its interests

through the contract or whether the plaintiff was prevented from making a free and

informed decision due to the defendant's fraud.

**5. Promissory Estoppel**

Under Michigan law, the elements of promissory estoppel are:

> (1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, (3) which in fact produced reliance or forbearance of that nature, (4) in circumstances such that the promise must be enforced if injustice is to be avoided.

McMath v. Ford Motor Co., 77 Mich. App. 721, 725 (1977). "Promissory estoppel is not a doctrine designed to give a party to a negotiated commercial contract a second bite at the apple in the event it fails to prove breach of contract." General Aviation, Inc v. Cessna Aircraft Co., 915 F.2d 1038, 1042 (6th Cir. 1990). However, parties are free to modify or enter new contracts if they choose to do so, and they may do so orally, even if there is a contract provision that ostensibly precludes oral modification. Quality Products and Concepts Co. v. Nagel Precision, Inc., 469 Mich. 362, 364 (2003). In the event that such an oral agreement is unenforceable due to the statute of frauds, promissory estoppel may provide an alternative means of enforcing the terms of the contract.

**B. Analysis**

The four substantive counts in WHI's amended complaint involve two events: the negotiation of the 2005 contract and the discussions leading up to WHI's purchase of the mechanical sorter. Because each claim of fraud rests upon essentially the same factual allegations, the Court will first analyze the negotiation of the 2005 contract with respect to all claims and then analyze the discussions leading up the purchase of the mechanical sorter.

### 1. The 2005 Contract

GP says that WHI's amended complaint fails to properly plead a claim of fraud in the inducement, silent fraud, or innocent misrepresentation. Further it says that, to the extent that the claims are properly plead, they are barred by the economic loss doctrine. The Court will first assess the sufficiency of the pleadings on an element-by-element basis and then address the applicability of the economic loss doctrine.

### a. Fraud in the Inducement

### I. Material Representation

WHI's claim of fraud in the inducement is based on Laurence's response to Roger Glawe's inquiry regarding the additional contractual clauses in the proposed 2005 contract. WHI alleges that Laurence responded by stating that the clauses were "required as a matter of rule" by GP's lawyers, that it "would be business as usual," and that "GP would indeed purchase the 125,000 tons of woodchips per year for the next three years." Taken as a whole, this response can be plausibly construed as a material representation involving a future promise with respect to GP's performance under the contract. These are well-pleaded factual allegations, not conclusory legal statements or mere recitations of an element of WHI's cause of action. Thus they are sufficient under FED. R. CIV. P. 8(a).

Although WHI's complaint could describe the facts surrounding Laurence's representation with more precision, it is sufficient under FED. R. CIV. P. 9(b). While WHI fails to specify the exact date of Laurence's representations, it does specify a time period of 14 days and indicates that the representations took place before the 2005

contract was signed. It also specifies that the meeting took place at a restaurant in Gaylord. Finally, it specifies both the speaker and recipient of the alleged representation. The complaint places GP on notice of the alleged misrepresentation and is sufficient to permit GP to answer in an informed manner. Coffey, 2 F.3d at 162; Kukuk, 2001 WL 1218557, at *5.

### ii. Falsity

WHI further alleges that Laurence's representation was false because GP closed the Gaylord plant on March 1, 2006 and invoked the 2005 contract's early termination clause. Because GP terminated the contract less than one year after it was signed, Laurence's representation that GP would honor the full three-year term of contract was false. This is a factual allegation that has been plead with particularity, meeting the requirements of FED. R. CIV. P. 8(a) and 9(b).

### iii. Knowledge

WHI alleges "upon information and belief" that, when Laurence made the representation, GP was "either in negotiations, anticipated being in negotiations or had negotiated with a third party(s) for the sale of itself, its assets, or its non-consumer product assets . . . . [H]owever, Georgia-Pacific Corporation desired to keep the Gaylord Plant supplied with wood chips in the interim and, in order to do so, it would be necessary to induce WHI to maintain an inventory of stumpage contracts to ensure a supply of woodchips that might be needed to supply the Gaylord plant." GP asserts that WHI's allegations are mere speculation and are insufficient under Iqbal. While a plaintiff cannot unlock the doors of discovery based on mere speculation, Iqbal, 129 S. Ct. at 1950, a plaintiff is only required to show plausibility, not factual certainty, id. at 1949.

Moreover, a court is permitted to rely on "its judicial experience and common sense" in assessing the plausibility of a plaintiff's allegations.  Id. at 1950.

Short of an admission of knowledge by a defendant, a plaintiff must rely on circumstantial evidence to prove subjective factors such as knowledge or intent.  In this case, GP and Koch finalized a $21 billion purchase agreement in 2005, less than seven months after Laurence's representations, and closed the plant and terminated the contract less than one year after Laurence's representations.  Despite WHI's lack of objective proof, it is plausible that GP was at least contemplating such a sale at the time of Laurence's representations.  In the Court's experience, $21 billion sales do not happen overnight and it is plausible that the negotiation of such a sale could take at least seven months.  Accordingly, WHI's complaint contains factual allegations that are sufficient to establish the plausibility of GP's knowledge of a potential sale and subsequent closure of the Gaylord plant.  At the very least, it is plausible that, knowing that negotiations for sale were underway, GP acted recklessly by making assertions about the Gaylord plant's long-term future.  In addition, WHI's assertion discloses the alleged fraudulent scheme - maintaining the flexibility to terminate the supply contract at any time while ensuring that WHI would maintain the stumpage contracts necessary to meets GP's needs.

### iv. Intent

While GP's intent is also a subjective factor, it is plausible that Laurence intended that WHI would act upon his representations.  WHI alleges that Laurence made the representations in response to Roger Glawe's inquiry regarding the additional terms in the 2005 contract.  The most reasonable explanation is that Laurence's representations

were intended to allay WHI's concern and convince it to sign the proposed contract.

### v. Reliance

WHI further alleges that, despite its concern over the risk associated with the additional clauses, it relied upon Laurence's representations and signed the signing the 2005 contract. Again, this is a well-pleaded factual assertion that is sufficient to satisfy the requirements of FED. R. CIV. P 8(a) and 9(b). The Court questions the reasonableness of WHI's reliance in light of the fact that the early termination clause remained a part of the contract. See APJ, 317 F.3d at 615 (finding reliance on a contracting party's assurances that it would honor the full term of a contract unreasonable in light of an early termination clause). Still, WHI has made a plausible claim of reliance and, as described below, the application of the economic loss doctrine makes any argument to the contrary moot.[9]

### iv. Damages

WHI alleges that it suffered damages when GP exercised the early termination clause because it lost the profits it would have earned during the remaining two years of the contract and also because it had invested in a substantial inventory of stumpage contracts and was unable to find another purchaser. Again, this is a well-pleaded factual assertion that is sufficient to satisfy the requirements of FED. R. CIV. P 8(a) and 9(b).

---

[9]Judge: I think that WHI's reliance was unreasonable as a matter of law in light of APJ and that this provides a sufficient basis to grant GP's motion to dismiss. However, there is perhaps an argument that WHI should have an opportunity to engage in discovery to prove that its reliance was reasonable. Since the economic loss doctrine provides a stronger basis for granting the motion, I think that we should leave this question open.

### b. Silent Fraud

WHI's claim of silent fraud relies on the same factual allegations as its claim of fraud in the inducement. Because a claim of silent fraud also requires a plaintiff to state each element of fraudulent misrepresentation, it is also sufficient under FED. R. CIV. P. 8(a) and 9(b) for the reasons stated above. The only additional requirement is that to state a claim for silent fraud, the alleged misrepresentation must be one of non-disclosure and there must be a duty to disclose.

WHI not only alleges that Laurence represented that GP would honor the full three-year term of the 2005 contract, but also that he failed to disclose that GP was negotiating, had negotiated, or was contemplating negotiating a sale of the Gaylord plant which might result in its closure. WHI says that GP had a duty to disclose this fact because it was the real reason that GP demanded an early termination clause in the 2005 contract. As described above, it is plausible, based on WHI's complaint, to infer that GP was in fact negotiating or anticipating the negotiation of a sale to Koch while the 2005 contract was negotiated. However, it is unclear whether GP had a duty to disclose this information. Although there is authority suggesting that a company does not have a duty to disclose a potential sale to employees or franchisees, O'Neal, 860 F.2d 1351; Sneyd, 142 F. Supp 2d at 824, these cases did not involve a specific inquiry by a plaintiff. Under Michigan law, a claim of silent fraud exists where a party "has expressed some particularized concern or made a direct inquiry" and the other party's failure to fully disclose results in a "misdirection" on which the parties relies. McConkey, 231 Mich. App. at 29. GP certainly had a duty to respond to WHI's inquiry in good faith and the scope of that duty is dependant upon the concern expressed by WHI and the precise nature of Roger Glawe's inquiry. Under the

facts alleged by WHI, a duty to disclose imminent sale negotiations is at least plausible.

### c. Innocent Misrepresentation

WHI's claim of innocent misrepresentation is based on the same factual allegations as the prior claims; the only difference is that WHI asserts that it is entitled to recovery even if the decision to close the Gaylord plant and terminate the 2005 contract was made by Koch without GP's knowledge. Although technically a separate element, a claim of innocent misrepresentation is a claim of fraudulent representation without the element of fraudulent intent. Thus a complaint that states a claim for fraudulent misrepresentation necessarily states a claim for innocent misrepresentation as well. Thus WHI has satisfied the requirements of Fed. R. Civ. P. 8(a) and 9(b) for the reasons stated above.

### d. Economic Loss Doctrine

Although WHI has successfully stated claims of fraud in the inducement, silent fraud, and innocent misrepresentation, GP may still be entitled to judgment as a matter of law if the economic loss doctrine is applicable to the claims. However, WHI says that GP's negotiations with Koch regarding the sale and/or closure of the Gaylord plant were extraneous to the 2005 contract, making the economic loss doctrine inapplicable.

While WHI may be correct that GP's negotiations with Koch for the sale of GP were extraneous to the 2005 contract, that argument misses the point. GP's right to terminate the 2005 contract after 90 days notice for any or no reason was a term of the contract. Therefore, any representation that GP made with respect to that term cannot be considered extraneous to the contract. When viewed in light of <u>Alumi-Bunk</u>, it is clear that the economic loss doctrine bars WHI's fraud claims with respect to the 2005 contract.

In <u>Alumi-Bunk</u>, the defendant made specific representations that it would "up-fit" the

purchased vehicles prior to selling them on the retail market.  Alumi-Bunk, 2007 WL 2118796, at *1.  Here, WHI alleges that Laurence represented that GP would honor the full three-year term of the contract, but failed to disclose that it was either negotiating the sale of the Gaylord plant or at least contemplating such negotiations.  GM failed to include a contractual clause requiring the defendant to upfit the vehicles; WHI failed to exclude the contractual clause permitting early termination.  WHI says that it would have demanded different contractual terms if it knew that the future of the Gaylord plant was uncertain.  By the same token, GM would not have offered the substantial discount if it had known that the defendant had no intention of upfitting the vehicles as promised.  In virtually every contract case involving allegations of fraud, the plaintiff asserts that it would have demanded different terms or refused to sign the contract but for the defendant's misrepresentations.  Such a showing is insufficient to avoid the economic loss doctrine.

In Alumi-Bunk, the Michigan Supreme Court adopted Judge Kelly's finding that the alleged fraud was "so intertwined with [the] allegations of breach of contract to be indistinguishable."  Id. at *10 (Kelly, J, dissenting).  Kelly further stated:

> What GM asserts amounts to fraudulent inducement was actually GM's unilateral mistake of failing to include a term in the CAP that GM later realized was critical. . . . At all times, GM was free to guard against any potential or perceived economic risk of defendants' failure to upfit the vehicles by including a provision in the CAP.  Defendants cannot be held liable for GM's failure to do so.

Id. at *11.  Like GM, WHI took GP at its word that it would honor the full term of the contract rather than protecting itself by removing the early termination clause.  Only after GP exercised its contractual right to terminate the 2005 contract did WHI realize that it had left

itself vulnerable to such an action.  As in <u>Alumi-Bunk</u>, GP cannot be held liable in fraud for WHI's failure to remove the early termination clause from the contract.  Therefore, WHI's fraud claims must be dismissed as a matter of law because they are barred by the economic loss doctrine.

### 3. Purchase of the Mechanical Sorter

### a. Fraud-Based Claims

WHI's fraud based claims relating to the purchase of the mechanical sorter depend upon virtually the same factual allegations as the fraud claims relating to the negotiation of the 2005 contract.  Again, WHI expressed concern over the early termination clause, Laurence assured it that GP would not exercise the clause, Laurence failed to disclose any information regarding the potential sale to Koch, WHI relied on Laurence's statements and purchased the mechanical sorter and additional stumpage contracts, and WHI suffered losses when GP terminated the supply contract.  The only differences are that the representations were made to Dan Glawe in June 2005 rather than Roger Glawe in May 2005 and that Laurence represented that GP would purchase all of the pine woodchips WHI could produce in addition to the 125,000 tons per year of deciduous woodchips already addressed in the 2005 contract.  For purposes of FED. R. CIV. P. 8(a) and 9(b), these are differences without distinction.  For the reasons stated above, WHI has plead each fraud claim with particularity and has included factual allegations sufficient to establish a plausible claim for relief.

However, these claims must also be dismissed due to the economic loss doctrine. As described below, it is unclear from the complaint whether the alleged oral agreement regarding the purchase of the mechanical sorter was a modification of the 2005 contract

or a new and independent contract. But under either scenario, the economic loss doctrine would apply. If the agreement was a modification of the 2005 agreement and the early termination clause remained in force, then the claims is no different from those described above. If the agreement was a new and independent contract, WHI still should have protected its interests by requiring the necessary contractual terms. To the extent that such an agreement included a long-term duration clause and did not include an early termination clause, WHI's recourse is in contract or promissory estoppel. To the extent that such an agreement failed to include a long-term duration clause or included an early termination clause, WHI committed a unilateral mistake for which GP cannot be held liable.

### b. Promissory Estoppel

To assert a claim of promissory estoppel, a plaintiff must allege facts sufficient to establish (1) a promise, (2) an expectation that the promise would induce action in reliance upon it, (3) reliance, and (4) circumstances such that the promise must be enforced to avoid injustice. WHI alleges that, in addition to its requirements under the 2005 contract, Laurence promised that GP would purchase all of the pine woodchips WHI could supply if WHI went forward with the plan to purchase the mechanical sorter. This allegation constitutes a new promise that could plausibly be construed as a supply contract. Further, it is clear from the allegation that GP's promise was expected to induce action in reliance on it – namely to purchase the mechanical sorter and supply GP with pine woodchips. In addition, WHI alleges that it did act in reliance on Laurence's promise by purchasing the mechanical sorter as well as stumpage contracts to provide the raw material for the pine woodchips. Thus the complaint contains specific factual allegations which support the first three elements of a claim of promissory estoppel.

However, it is impossible to determine whether or not the contract must be enforced to avoid injustice without first assessing GP's obligations under the alleged contract. Because the alleged agreement was oral, there is no document outlining all of the contractual terms. The only contractual term that is provided with any certainty is the quantity term - all of the pine woodchips that WHI could produce.

On one hand, it is plausible that the supply contract was merely meant to be a modification of the 2005 contract, keeping all of the other terms in place. If that were the case, the contract would have had a three year duration, but the early termination clause would be in place. Under those circumstances, GP would have had a right to terminate the contract and there would be no injustice in permitting it to do so.

But on the other hand, it is equally plausible that the supply contract was a new and independent contract which contained different terms. First, WHI alleges that Dan Glawe told Laurence that WHI would not purchase the mechanical sorter if GP retained the right to terminate with 90 days notice. Thus it is plausible that a new contract would not have included such a clause. Further, Laurence stated that GP would continue to purchase deciduous woodchips <u>for three years</u> and would also purchase all of the pine woodchips that WHI could produce. Thus it is plausible that the new contract was for a term of three years. WHI could not enforce such an agreement under contract law because it would be unenforceable under the statute of frauds. However, WHI spent considerable sums of money in reliance on Laurence's promise and it would be unjust not to enforce that promise under this scenario. Because WHI can establish a plausible claim for promissory estoppel based on an oral supply contract with a three-year term, GP's motion must be denied with respect to the promissory estoppel claim.

**V. Conclusion**

For the reasons stated above, GP's motion to dismiss is GRANTED with respect to Counts

I, II, and III and is DENIED with respect to Counts IV and V.  The case will go on with

respect to WHI's claim of promissory estoppel and, to the extent it is still relevant, the claim

for exemplary damages.

      SO ORDERED.


      s/Avern Cohn                     
      AVERN COHN
      UNITED STATES DISTRICT JUDGE


Dated:  July 14, 2010


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record
on this date, July 14, 2010, by electronic and/or ordinary mail.

      s/Michael Williams              
      Relief Case Manager, (313) 234-5160